# Mount Holly Paper Company's Appeal.

1. All railroad companies incorporated by or under special acts, are subject to the regulations of the General Railroad Law of February 19th 1849, Pamph. L. 79, except in so far as such regulations are specially altered in the said special Acts or are inconsistent therewith.

2. A., the president of a railroad company chartered by a special act of Assembly in 1857, delivered to B., a creditor of the firm of C. & Co., certain certificates of stock in the railroad company then standing in A.'s name, together with a power of attorney in blank, to transfer the same. The shares were not valid, having been issued by A. in collusion with the other officers of the company, in excess of the charter limit. The delivery was made in order to secure the past and future indebtedness of C. & Co. to B., and it was agreed that the shares should not be transferred into B.'s name without notice to A. Several years passed without any attempt on the part of B. to effect said transfer, and in the meantime, A. became heavily indebted to the company. In certain equity proceedings afterwards instituted to determine the relative rights of B. and the railroad company as to the shares pledged by A. to the former,—*Held*, that the provisions of section 7 of the General Railroad Law of February 19th 1849, Pamph. L. 79, forbidding the transfer of shares so long as the holder is indebted to the company, were applicable, and that, therefore, B. was not entitled to demand from the company a transfer of the shares into his own name, or the payment of the amount for which they had been pledged to him, without first discharging the indebtedness of A.

January 31st 1882. Before Sharswood, C. J., Mercur, Gordon, Paxson, Trunkey, Sterrett and Green, JJ.

Appeal from the Court of Common Pleas No. 2, of *Philadelphia county:* In Equity: Of January Term 1882, No. 53.

Appeal of the Mount Holly Paper Company from a decree of said court, sustaining the exceptions of the West Philadelphia Passenger Railway Company, to the report of the Master

3 Outerbridge.—33

in the matter of a cross bill filed by the said railway company, in a cause wherein Sarah Swain, and William M. Baugh, were complainants, and the said West Philadelphia Passenger Railway Company, its officers and directors, and others, were defendants.

The original bill in equity set forth, inter alia, that by a fraudulent combination between the president, treasurer, and secretary of said company, a large number of certificates of stock had been issued, which, though duly attested by the officers of the corporation and sealed with its seal, were fraudulent; that the company had received no consideration therefor, and that the same constituted an unauthorized over-issue. The bill prayed that such certificates be decreed null and void and be surrendered up to the company for cancellation.

The railway company filed an answer and subsequently a cross bill against the said complainants and numerous other parties who had appeared by counsel, including the Mount Holly Paper Company, submitting themselves to the order of the court in the premises. Certain of the defendants in the cross bill also filed cross bills in their own behalf.

The cause was referred an Examiner and Master, David W. Sellers, Esq., before whom it was agreed by counsel that relief might be granted to each of the defendants in the cross bill, as though each had filed a separate cross bill in their behalf, suitable to all the proofs in the cause.

The Master found the facts, as far as they relate to the case of the Mount Holly Paper Company, to be substantially as follows:—

The West Philadelphia Passenger Railway Company was incorporated by a special Act of the Legislature of Pennsylvania, approved May 14th 1857 (P. L. 1858, 585). In October 1873, the firm of J. R. Nagle & Co., was indebted to the Mount Holly Paper Company in the sum of about $39,000. In answer to their demand for security, John S. Morton, president of the West Philadelphia Passenger Railway Company, at the request of Nagle & Co., called upon the treasurer of the Mount Holly Paper Company, and made the following proposition, which was accepted, viz.: " That if the Mount Holly Paper Company would advance the firm of J. R. Nagle & Co. the additional sum of $5,000 in cash, and divide the whole amount of indebtedness into notes of a convenient size for said J. R. Nagle & Co. to meet, and if not convenient to pay as they matured, to renew such or such parts thereof as they might not be able to pay from time to time; and would continue to said J. R. Nagle & Co. a line of credit, by continuing to sell them goods; he the said John S. Morton would indorse their notes, and to secure their payment, would give the Mount Holly Paper Company stock of the West Philadelphia Passenger

Railway Co. as collateral." On the receipt of 550 shares of said stock, in certificate 1727 for 400 shares, and 1750 for 150 shares, standing in the name of John S. Morton, a paper was given by Charles S. Mullen to John S. Morton, stating that the stock was to be held "upon the express understanding and agreement as collateral security for the payment of certain promissory notes then discounted, or thereafter to be, of John R. Nagle & Co." The notes were specified, amounting to $44,837.38. The agreement further provided, that if there should be default, "before making any disposition of said stock, written notice should be served upon said Morton," and that "upon payment of these notes, or those given in renewal, with the written consent of the said Morton," the stock should be returned. By this paper it was further agreed that unless there was default, "said stock shall not be transferred on the books of the company." The sum of $5,000 was advanced as agreed, and the indebtedness divided "into notes of a convenient size." The notes now held in execution of this agreement amount to $22,000. The Master found that the agreement was in consideration of a forbearance to sue John R. Nagle & Co. and of a further cash advance to them, and that said agreement was executed.

The said certificates of stock were delivered to the Mount Holly Paper Company on October 15th 1873, and were never transferred from the name of the said John S. Morton, nor was any demand for such transfer made.

Several years subsequently to that date, and before the filing of the bill, John S. Morton became indebted to the West Philadelphia Passenger Railway Company to the amount of $93,957.36, which remained due and unpaid at the time of the decree in this case.

The Passenger Railway Company contended before the Master, that, under the seventh section of the General Railroad Act of February 19th 1849 (P. L. 82), which provides "that no certificate shall be transferred so long as the holder thereof is indebted to said company unless the Board of Directors shall consent thereto," the Mount Holly Paper Company was not entitled to demand a transfer of the said stock from the name of John S. Morton, or to recover the amount of said notes for which said stock was pledged, until Morton's indebtedness to the company should be paid. On this point, the Master reported as follows:—"The Master is of opinion that the Act of 1849 in this particular has no application to the present corporation. All of the subject matters of the Act of 1849, relative to the organization, the subscription for stock, the election of directors, and the execution of the corporate franchise, are supplied in the text of the charter. Unless in the charter a reference is

made to the general railroad law, it is not to be incorporated. In the legislation of the State the franchises and charter of a horse railway company are not supposed to be included in the general railroad law. (City *v.* Passenger Railway, 8 Philada. 648.) The charter of the Philadelphia and Darby Railroad Company, upon which a similar question arose in Willis *v.* Darby Railway (6 Weekly Notes 461), contained an express provision that it should be 'subject to all the conditions and restrictions conferred and imposed by an Act to regulate railroad companies' (P. L. of 1858, Appendix 556).

"Even though it should be applicable, the Master holds that its scope is to be wholly confined to the transfer of valid stock, and that when the redress is to a grievance arising from an over-issue, as here, it is without force. No lien for indebtedness could exist on valid stock unless stipulated in the charter. Such liens are not recognized at common law: Dock Co. *v.* Heron, 2 P. F. Smith 280."

The West Philadelphia Railway Company and others filed exceptions to the Master's findings, (1) in holding that the general railroad law of 1849, did not apply to the West Philadelphia Passenger Railway Company, and that the Mount Holly Paper Company were therefore entitled to demand a transfer of said shares without the prior payment of Morton's indebtedness to the company, and (2) in holding that if said Act of 1849 were applicable to said corporation, the proviso prohibiting transfers of stock from a debtor of the company until payment of the debt, would apply only to valid stock.

The court, after argument, sustained the said exceptions, holding that the railway company had a right of lien by virtue of the General Railroad Law of 1849 for the indebtedness of its stockholders upon the stock standing in their name, and entered a decree : "That upon the payment to the said Passenger Railway Company of the aforesaid indebtedness of said John S. Morton, to wit, the sum of $93,957.36 with interest from the 22nd day of September 1877, the said Mount Holly Paper Company shall be entitled to receive from the said Passenger Railway Company the sum of $22,000 with interest from the dates of maturity of the notes aggregating said amount, and shall thereupon forthwith deliver to the said Passenger Railway Company, to be cancelled, said certificates. . . . . ."

The Mount Holly Paper Company thereupon took this appeal, assigning for error the above finding and decree of the court.

*James Otterson* and *Samuel Dickson*, for the appellants.— The court found in our favor, as to our right to recover the amount of the notes for which the stock was pledged, but sub-

ject to the company's right of lien, under the general railroad law of 1849, to have Morton's indebtedness first paid. In other words, they decided that on payment of $94,000, we could receive $20,000! The error was in holding that the general railroad law applied to this company, which was chartered, not under the general law, but by a special Act not containing the proviso of the general law that a stockholder's debts to the company must be paid before stock in his name could be transferred.

Such a lien is unknown at common law, and can only exist by statutory enactment expressed in the Act of incorporation or in by-laws made by authority of the Act : Steamship Dock Co. v. Heron, 2 P. F. Smith 280 ; Mass. Iron Co. v. Hooper, 7 Cush. 183 ; Sargent v. Franklin Ins. Co., 8 Pick. 90 ; Angell & Ames on Corp. 355. It has been held that the general railroad law is not applicable to a city horse railway company, unless reference is made thereto in its charter : The City v. Passenger Railway Co., 8 Phila. 648. This is a necessary conclusion from a comparison of the two Acts, which relate to essentially different classes of companies. The general Act relates to steam railways only running through the country, operated by locomotives, for the transportation of freight as well as passengers. All its provisions are based upon this assumption, and are inapplicable to a city passenger railway operated by horses. The latter is simply an omnibus company using tramways laid upon the public streets. That the legislature did not *intend* that the general railroad law of 1849 should apply to street passenger railways, is clear from the fact that such passenger railways were not known or in existence until long subsequently.

But if the general railroad law does apply, the provision as to lien can only apply to indebtedness arising from unpaid stock subscriptions, and not to indebtedness arising from other causes long after the stock was pledged : See section 7 of Act of 1849. Secret liens are against the policy of the law, and can only be sustained by express enactment, as in the Bank Acts.

In any case, the lien can only exist as to *valid* stock, and not to an unauthorized over-issue. The position of the appellants is as though they were suing at law in an action of deceit for damages for a false representation, viz. : in issuing a false certificate of stock, *i. e.*, not a certificate of (good) stock, *i. e.*, in law *nothing ;* and it is absurd to say that the company can have a lien upon that nothing. The company admit a liability to the holders of over-issued stock, founded on the misconduct of their officers in issuing it. For them to contend at the same time that such misconduct gives rise to a right in them to withhold compensation to third persons who have suffered from the fraud, is self-contradictory. They cannot thus reap a benefit growing out of the fraud of their own officers.

[Mount Holly Paper Co.'s Appeal.]

The ground on which a bona fide holder of a certificate of stock accompanied by a power of attorney to transfer, in blank, can recover against the company, is the broad one that by the uniform business of the money centres of the world, it is the intention and practice alike of the corporation, the receiver and the public, that the certificate and power is the *title* as against the corporation, as well as for delivery according to the rules of the Stock Exchange and for all other purposes. Otherwise business could not be transacted as it now is. It often requires two or three days to complete a transfer, while the transactions are frequently for a single day or part of a day; moreover, the books of all corporations are closed annually against transfers for considerable periods of time. It involves no hardship to corporations—they can protect themselves, even against dishonest officers, by having a stock registry, which can be examined at any time, and which renders an over-issue impossible.

*Joseph R. Rhoads*, and *John G. Johnson*, for the appellees.— The most the appellants believed when they took the stock was, that it was good stock—but if so the company could have set off Morton's indebtedness. Yet they now claim they are in a better position, as holders of bogus stock, than if it had been good stock. It is argued that the bogus stock is in law nothing, and that a lien cannot exist on nothing. But if it is not stock, no claim can be founded on it, and if it is, the statutory restriction as to transfer, which is not a mere lien, applies.

That the charter of this company was subject to the general railroad law of 1849, so far as its provisions were not expressly supplied, is clear. The Act of 1849 expressly provides that it shall be applicable to all railroad corporations, subsequently incorporated by special Act. The lack of specific provisions in the charter of this company as to the issue, and transfer of stock, throws the company back to the provisions of the general law, in this respect. No distinction can be drawn between the terms railROAD and railWAY; a general statute applicable to one is applicable to the other: Hestonville Railway Co. *v.* Philadelphia, 36 Leg. Int. 452.

The issuing of certificates, as evidences of the title to stock, being a statutory duty of the corporation, the company only insures the title to the particular holder, to whom it issues the certificate, unless transferred on the books to an assignee, and then a new certificate issues to him. There is no general representation for the benefit of purchasers of the certificate, with a blank power of attorney to transfer; the principle of estoppel does not exist as to strangers; the certificate recites on its face, that it is not until after actual transfer, that assignees can claim: Central R. R. Co. *v.* Ward, 37 Georgia 531. The

case is an analogous to the liability of the recorder of deeds, for the issue of a false certificate of search—he is only liable to the party to whom it was issued : Peabody Building Association *v.* Houseman, 11 W. N. C. 193. The transferee of certificates should inquire of the corporation, as the assignee of a bond must inquire of the obligor. The principle of estoppel is not applicable. The company made no untrue representation to these appellants ; the latter agreed to take Morton's indorsement of Nagle & Co.'s notes, and his stock as collateral, expressly agreeing not to demand a transfer unless default was made in the notes. They prove no damage resulting therefrom ; on the contrary, Nagle's indebtedness on the notes was at that time $44,000, while now it is only $22,000, and so long as a loss is not established, no estoppel can arise.

Chief Justice SHARSWOOD delivered the opinion of the court February 13th 1882.

The Act of Assembly passed February 19th 1849, entitled "an Act regulating railroad companies," Pamph. L. 79, provides "that whenever a special Act of the General Assembly shall hereafter be passed, authorizing the incorporation of a company for the construction of a railroad within this Commonwealth," such company shall be subject to the regulations contained in that Act. By the seventh section, after enacting that certificates of stock shall be issued, "which certificates of stock shall be transferrable at the pleasure of the holder, in a suitable book or books to be kept by the company for that purpose, in person or by attorney duly authorized, in the presence of the president or treasurer," it is "provided that no certificate shall be transferred so long as the holder thereof is indebted to said company, unless the board of directors shall consent thereto."

The West Philadelphia Passenger Railway Company was incorporated by Act of Assembly passed May 14th 1857 (Pamph. L. 1858, 585, appendix), and we are clearly of opinion that it was subject to the general regulations of the Act of 1849, unless specially altered in that charter, or inconsistent therewith. It is not pretended that there is any such alteration or inconsistency so far as the provision as to the transfer of certificates is concerned. It is contended, however, that the Act of 1849 speaks of acts authorizing an incorporation, whereas, by the Act of 1857, the appellees were directly incorporated. We think, however, that this is a distinction without a difference. The legislature evidently meant that all companies incorporated by or under special Acts should be subject to the general regulation of the Act of 1849.

The appellants were holders of certificates of stock fraudulently issued in excess of the number of shares authorized by

[Mount Holly Paper Co.'s Appeal.]

the charter. They had become holders by the delivery to them of a power of attorney from John S. Morton, in whose name they stood—who was the president of the company, and by whom they had been fraudulently issued. They had not taken the necessary precaution to have them transferred on the books of the company. Had they done so without the consent of the Board of Directors, a different question might have arisen. The company was liable, we may assume, for the fraudulent issue of the stock by their officers; but certainly, the holders can have no other or higher right than the bona fide holder by assignment and power of attorney of a real certificate issued to John S. Morton, as an original subscriber, and standing on the books of the corporation in his name. John S. Morton was heavily indebted to the company, on separate and independent transactions, altogether different, and superadded to his liability to the company for his fraud. The appellants, as to the stock standing in the name of John S. Morton, whether fraudulently issued in excess of the charter or not, stand in his shoes as against the company. It matters not when Morton's debt to the company had been incurred. By the provision of the law he could not transfer such stock without the consent of the board of directors. In fact, it never was transferred.

It is said, however, that these certificates fraudulently issued were null and void. They evidenced no stock. It is asked, triumphantly, How can there be a lien on that which had no existence? The argument is certainly ingenious, but it rests upon a misapprehension of the rights of the appellants. Their claim on the company was not, indeed, on the stock. It was a claim to be indemnified for the fraudulent acts of the officers of the company, from which they allege that they have suffered damage. They might have demanded a transfer, and upon refusal have brought an action for damages. The defence to such an action could have been Morton's indebtedness. If, instead of taking that course, they had sued for damages for the fraudulent act, they could still have been met by the same plea. If you had been in possession of valid certificates, you could not have recovered for a refusal to allow you to transfer; how, then, can you recover on these false and fraudulent certificates? This would clearly be inequitable; and this proceeding is in a court of equity.

We think there was no error in the decree of the court below.

Decree affirmed, and appeal dismissed at the costs of the appellants.